Final case for argument is 16-2281, eResearchTechnology v. CRF. Thank you and may it please the Court, this Rule 12b-6 appeal relates to the patent eligibility of two separate and distinct categories of computer-implemented inventions which improve the technological process underlying evaluation of patient compliance with research protocols in clinical drug trials. So we've got a body of law now that's been developing over the past year or two with regard to Section 101, Steps 1 and 2. What do you, just our best precedent in your view that supports your position in this case that these claims are patent eligible? Yes, Your Honor. There are multiple precedents which in part are pieced together. First of all, there's the McCrow case and the McCrow case at least in part tells us that the utilization of specific rules mainly with, in that case, two identified characteristics applied in a technological way can be patent eligible in Steps 1 and 2 of the Alice test. Secondly, we also have the Deere case which tells us that whether it be with a conventional form... Deere, the Supreme Court case from back in the 70s. That's correct. Right. I think what the Chief Judge was asking is what cases from our court after Alice are helpful to you. Certainly. Thank you. McCrow, as I've stated, also in part MDOCS, which tells us that looking at the contextual claim language as a whole, including terms that either haven't been construed or not, this can supply us with additional information indicative that there's no abstract idea. And lastly... Well, that seems to be you're stating a legal principle. I was more interested in the claims themselves, comparing the claims, because I think your friend makes a compelling case that you can map a lot of these terms and these claims onto those other cases in the other bucket where we've said there's patent ineligibility. Thank you, Your Honor. Let me take a step back, then, and give the court some context. The prior RQA of doing compliance evaluation, and this is set forth in the form of patent specification, basically had an ad hoc human evaluation of collected patient data. Each of these patents set forth, in the case of the first category, which is the first three patents, the 180, the 970, and the 447, there's a comparative algorithmic technique, and let me explain what that is. We take metadata, and the metadata is defined in the patent. It's either historical compliance data, historical protocol data, and there are definitions supplied to that. Based upon that metadata and other characteristics, and this is, for example, with regard to claim 101 of the 180 patent, we then generate an algorithm, and the patent specification talks about how that is a derived algorithm. It's derived from metadata. It's not the patient's collected data, whether in the current clinical trial or otherwise. The claims don't identify the algorithm. They just simply say you derive an algorithm. Is that correct? Your Honor, I think they go further than that. Do they give us an algorithm? Well, let me explain. They do. If we look at, for example, some of the claims in the 180 patent, we have an algorithm that's generated, and that's by quantitative analysis of specified characteristics. There's then a translation, in other words, a derivation into a decision rule or a prediction rule. And in fact, in the 970 patent of— I'm sorry. If you're looking at the 180, we've got 34 claims you've been able to give me. Claim 11 is the one that we focus on. So I would suggest to the court— You have claim 11 and claim 24, I think, are the two that you focus on. We can take claim 1 and claim 24. And the district court held that claim 1 is a representative of claim 24. So let me walk the court through the claim. So the first thing that we're going to do is we're going to require metadata. It's not the patient's collected data. It's the historical compliance data, perhaps from earlier clinical trials. And there are examples of that given in the patent. The next thing that has to be done is we derive an algorithm. Now, some claims talk about that as a preferred compliance threshold. Other claims talk about it as a predictive algorithm. Other claims talk about it in other terms. That algorithm is derived from the metadata. And then, according to some— But again, to my question, we aren't told what the algorithm is. We're simply told that an algorithm is derived, and then you move from there to the decision rule. Isn't that right? That's not quite correct, Your Honor. Okay, well, tell me where you say what the algorithm is. The 970 patent, for example, which is a 435 reference in the 180 patent. That gives us an equation for a decision group. Okay, and what is it? It's derived from the metadata. That's something I have with my fingertips. This is claimed, or this is simply a misstep? Well, the district court was asked to construe what the decision rule was. And we told the court that a decision rule was a reformatted algorithm in accordance with the specification, one example of which is given in the 970 patent. The left is F, column 7, lines 20 through 26. Right. That is a transformation for the following reason. You take the metadata, you derive an algorithm from that metadata, and then you derive a decision rule from that algorithm. Where's the algorithm in 970? It's at column 7, lines 20 through 26. That's a sample decision rule. Right, but if you go back through the spec, it says in column 6 of the 970, decision rules are essentially reformatted algorithms that can be applied to current subject compliance. That's an example. I mean, your claim is not limited to that particular algorithm, as I understand it. Your claim is any algorithm. If those numbers and even the values, even the parameters were completely changed, it would still be an algorithm that would satisfy the claims, would it not? Your Honor, the claims are not limited to the specific equation. I would agree with that. All right. That was essentially what I was asking, is any algorithm would do? It's not any algorithm. Well then, OK, what are the limits on the algorithm? The limits are as follows. First of all, the algorithm has to be derived from specified metadata. That's the historical compliance data and the protocol data. And that is discussed in the patent. There are definitions of what that is. So we're not collecting patient data and simply manipulating that existing patient data and displaying it. That's not what's happening here. In fact, the problem in the prior art, as the background points out, is that you would simply collect patient data. And then there would be ad hoc analysis of that data. So we have here an ordered combination, steps which are not conventional. This is not something that we do. It is not conventionally routine and certainly not in the prior art to acquire metadata with specified characteristics, to then derive an algorithm based on quantitative analysis of that data, and then to go further and do a translation, or we would say a further translation of a decision rule, which can then be applied to each individualized patient to generate a result as to whether there's compliance or not. So Your Honor, if I may just give an analogy, this is not simply taking a word in the English language and saying, hey, I'd like a translation of that into the equivalent Spanish word. When you take the metadata and you derive the algorithm, and then you go further and you derive the decision rule, that's something like going from a word to something in binary format. It's different data. But it's data that by the time you get to the decision rule, it has been transformed into a state where you can apply it to an individual patient. That's what this technology is about. There's nothing in the record here, Your Honor, that this was conventional, routine, et cetera. There's nothing in the record that suggests that all we're doing is collecting data and displaying it on a general purpose computer. I would submit to the court that this case is quite close to the Macro case. Let's look what happened in the Macro case. You had a rule generated pursuant to two characteristics, if I can recall correctly. One was the phoneme sequence. And I think I'll spell it P-H-O-N-E-M-E. And then the entry of the timeliness of the phoneme sequence. Those two characteristics were not necessarily non-conventional. And then what happened is once that rule was generated, you applied it to three separate data streams, and then you got your animation. So that's the essence of this here, Your Honor. It's not in the district court was wrong. This is not simply collecting data in a conventional way and then displaying it. OK. Why don't we hear from the other side? Excellent. May it please the court, what we just heard here is an argument regarding there was a question posed whether or not there was an algorithm claimed in the claims. There are no algorithms claimed in the claims. And that is the problem. What we heard was we talked about a decision rule, which is a separate part of those claims. And that decision rule, as explained in the specification, can actually involve human interaction. There is no explicit saying this is what a decision rule is. So everything in this claim, everything in all 227 claims of all five patents all involve collection of data, analyzing that data, and then applying that to clinical trial compliance. Can you move to the point that your opposing counsel ended with the McCrow case and talk about the McCrow? Yes, I can talk about the McCrow. It's different. And it's different because of the McCrow, there is a specific rule. There is a rule that is applied in that case. And then this is a more technological issue. So it's an animation. You have an animation going on here. Whereas in this case, we're talking about organizing human activity. And there's a specific rule in McCrow that is used to be applied in the claims. In these claims, there is no specific rule. And that was just acknowledged right here. So on that one point alone, there's a very big distinguishing point between McCrow and all of the claims that we have here. I think the Chief Judge alluded to in her first question earlier is that we've sort of filtered out cases here into two buckets, one dealing with improvements to computer technology. This is in the context of computer applications and others involving just using a computer to do something which is otherwise, let's say, for lack of a better term, mundane. How does McCrow fit into the first bucket in your view rather than the second? Because the court definitely put it into the first bucket. But it didn't seem to me to be obvious that it necessarily belonged there. Well, in my view, Your Honor, it was a technological. It was animation that's done on the computer. So it was improving that process that was done on the computer of the animation where you had to have an individual look at stop. It wasn't a completely automated process in the computer. The individual had to look at the phenomes where it started stopping and the shape of the person's mouth to do it. And then McCrow had a specific rule that allowed for automation of that particular. Well, how specific was the rule? And that's really where it struck me looking at the claims. I wasn't on the panel. So I'm looking at this objectively. It struck me that it was pretty generic. It struck me as well as being pretty generic. It was a genus claim. So the difference here is there was at least a rule that you could use and have the parameters of that rule when figuring out. But in these claims, there is no rule. He just acknowledged that there is, in fact, no algorithm. So there's no rule at all that you can use. In these claims, it can be any rule. You look at data. You determine whether or not a person complied or not. You wanna make an analysis of pre-existing clinical trial data to determine, okay, this person has missed two compliance periods. So maybe this person's gonna be a problem. So we'll make an algorithm that says, if you missed two, then let's apply that to the data that's going on in the current clinical trial and let's flag these individuals and either prompt them to make sure they respond, exclude their data, or do one of these things. But all of this is all around organizing the human activity of the clinical trial as well, which is different from McRowe, where you have a technological animation that you're working on in a computer environment to animate a video and add sound to it. Okay, I think the closest cases, which we have cited in our brief, are fair warning, electric power, and LIP. And we believe those all stand for the proposition that gathering information. Which was the last, I'm sorry? OIP. Oh, yes, OIP, right, okay. The process of gathering and analyzing information is not patentable subject matter under ALICE. And all of these claims, all five patents, all 227 of them are involving providing data, analyzing data, and then using that in some way or fashion for clinical trial compliance. If we want to look at the two steps for each, if we want to go through the representative claims for each one of the patents, the representative claim in the D180, as you can see, providing data on time that's data entry. Generating for compliance threshold. So you're generating the data, or you have the data, you get it somehow, old data, and then you generate your compliance threshold. You say, what is it that makes people comply from this old data? And then obtaining said subject compliance information from subject in said group of subjects. And this one includes an electronic device, which helps in real time, because before you had a paper diary, so it's harder to tell the time period when people missed whatever they were supposed to report, wasn't easily identifiable. But now with the implementation of the in-house device, it makes that in real time a lot easier to know this person didn't do this at this time. I also think, so in summary, the 180 patent is directed to- Do you happen to know, does the prior art involve instances in which there is electronic reporting of compliance? I do not know the answer if there's electronic- I'm not sure it's relevant. I do know all the data, even if it's on paper, is put into a computer to be analyzed later. So it always, that data is all available, and, in fact, analyzed, and people are excluded from that. And I believe the patents also acknowledge some of this in the sense that there is, in all the patents, there's what's described as the illustrative embodiment, which I would say that's the exemplary embodiment of the invention. And in the paragraph, it says that the invention is an actuarial approach to predicting patient compliance. And that approach is consistent with research showing the superiority of actuarial prediction of human behavior as compared to subjective clinical judgment. So we're taking past quantitative analysis techniques that are used in all actuarial fields, and we're applying them to clinical trial, past clinical trial data to generate a rule, and you use that rule, then, to the current clinical trial data and say these people are not compliant, to try to get, to affect the activity of complying with that specific trial requirement. Moving on to the other patents, I apologize, let me go back one second with the 1801. We're obtaining past data, applying quantitative analysis to past data to drive a compliance threshold. Well, again, in the specification, there's no restriction on quantitative analysis. It's all examples of past types of quantitative analysis. So we're not applying any new data transformation, anything new to these, in the specification or in the claims. And I think the reason why we're lacking examples, concrete examples of what the rules are, what the quantitative analysis is, to get you these better results is because there aren't any listed. It's all previously used technology data techniques. And then you obtain new subject data and you compare the new subject data with your compliance threshold that you have. So the abstract idea is gathering data from past clinical trials, analyzing that data, and applying the results of the analysis of the current clinical trial to determine if some action is needed. In the 519 and the 605 patents, the abstract idea is classifying clinical trial results by entering data and comparing it to a norm, which that could be a mental process. The step two, there's no inventive concept to transform the abstract idea. The claims include no meaningful restrictions on the mental process of comparing data to classify results. And with respect to the 970 and the 447, again, step one, the abstract idea is collecting and analyzing data to predict or determine noncompliance with the clinical trial protocol. Step two, there's no inventive concept to transform the abstract idea. The claims only recite generic data collection and analysis steps. And the 970 patent claim doesn't even include a computer, which is required, but it doesn't even involve a computer in that particular one. So we think these claims are all very similar to the fair warning, electric power, no IP cases. We think it's distinguishable from McGrow for the reasons that we've discussed. If there are any further questions. Thank you. Thank you. Thank you. Thank you, Your Honor. May I briefly? Fair warning, electric power, and OIP are all completely irrelevant here. All these cases, for example, as noted in fair warning, were mere implementations of an old practice in a new environment. That's the amount that we have here. Secondly, I would submit to the court that the claims here are as specific, if not more specific, than the McGrow case in terms of the specified rule and the application of that rule as an ordered combination to get the result. I would also submit to the court that in the Baskin case, the court noted that the non-conventional arrangement of elements of the claim to get a result can be patentable subject matter. And in the Baskin case, unlike ours, the individual elements were generic, well-known, and routine. That's not the case here. If anything, Your Honors, I would submit to the court that this case, if at all, should be addressed under Section 112, not 12b-6, where we have to accept as true the underlying factual allegations. If it's true that the claimed subject matter here is overbroad, then that's a Section 112 issue. But you can't address this by simply overgeneralizing the claim language like my colleague has done. And lastly, the one sentence in the spec, and this is at column 14, lines 48 through 50, of the 180 patent, thank you, Your Honor, which says, optionally, translation of algorithms may involve human input and additional factors. That doesn't equate with creating the algorithms here or the decision rules by a parametric process. If there are no further questions. Thank you. Thank you. We thank both sides. The case is submitted. That concludes our proceedings. Thank you. All rise.